# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **PHYLLIS A. HURLEY,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:08-cv-00059 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: GLEN M. WILLIAMS |
| Defendant. | ) | SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

### I. Background and Standard of Review

Plaintiff, Phyllis A. Hurley, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Hurley's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3). (West 2003 & Supp. 2008).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Hurley protectively filed her applications for SSI and DIB on April 21, 2005, alleging disability as of June 1, 2001, (Record, ("R") at 59-64, 327-332), due to hepatitis C, depression, asthma and loss of hearing in the left ear. (R. at 69-75.) The claims were denied initially, (R. at 44-48, 333-337), and on reconsideration. (R. at 43, 51-53.) Hurley then requested a hearing before an administrative law judge, ("ALJ"), who held hearings on December 5, 2006, May 7, 2007, and October 3, 2007, at which Hurley was represented by counsel. (R. at 341-349, 350-353, 354-368.)

By decision dated October 12, 2007, the ALJ denied Hurley's claims. (R. at 12-25.) The ALJ found that Hurley met the insured status requirements of the Act for DIB purposes through October 12, 2007. (R. at 17.) The ALJ also found that Hurley had not engaged in substantial gainful activity since June 1, 2001, the alleged onset date. (R. at 17.) The ALJ found that Hurley suffered from severe impairments, namely chronic hepatitis C, major depressive disorder/dysthymic disorder, anxiety, not otherwise specified, borderline intellectual functioning and asthma. (R. at 17.) The ALJ found, however, that Hurley did not have an impairment or combination of impairments that met or medically equaled the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) The ALJ found that

2

Hurley's hepatitis C and asthma limited her to a residual functional capacity, ("RFC"), for medium[1] work, which involves being able to lift, carry, push and/or pull 25 pounds frequently and 50 pounds occasionally and sit, stand and/or walk for six hours out of an eight-hour workday, with no concentrated exposure to fumes, odors, dusts, gases or poor ventilation. (R. at 23.) The ALJ noted that Hurley's depression, anxiety and borderline intellectual functioning further limited her to simple, routine unskilled work. (R. at 23.) The ALJ found that Hurley could perform her past relevant work as an interviewer, diary farmer and fast-food worker. (R. at 25.) Therefore, the ALJ concluded that Hurley was not under a disability as defined by the Act, and that she was not entitled to benefits. (R. at 24.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

After the ALJ issued his decision, Hurley pursued her administrative appeals, (R. at 10), but the Appeals Council denied her request for review. (R. at 5-7). Hurley then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.148 (2008). This case is before this court on Hurley's motion for summary judgment, which was filed on March 5, 2009, and on the Commissioner's motion for summary judgment, which was filed on April 6, 2009.

---

[1] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c), 416.967(c) (2008).

3

## II. Facts

Hurley was born in 1972, (R. at 76.), which, at the time of the ALJ's decision, classified her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Hurley has a high school education and past relevant work experience as a dairy farmer, interviewer, fast food worker and cashier. (R. at 70.)

At the first hearing on December 5, 2006, Hurley testified that she had trouble reading and could only write a "little." (R. at 345.) Hurley testified that she worked on a dairy farm for about a year where she fed and milked cows. (R. at 345.) Hurley stated that the heaviest thing she lifted during this time weighed about 150 pounds. (R. at 345.) Hurley also noted that she worked as an interviewer whereby she called people on the phone to get their opinions on different things. (R. at 345.) Hurley noted that this job also required use of a computer. (R. at 346.)

Hurley testified that she also held a job at a fast food restaurant, which required her to take orders at the front counter. (R. at 346.) Hurley noted that this job required standing for extended periods. (R. at 346.) Hurley also stated that she worked the nightshift at a convenience store for about three to four months, whereby she worked as a cashier in addition to performing tasks such as cleaning and stocking. (R. at 346.) Hurley noted that the heaviest thing she had to lift at this job weighed approximately 25 to 30 pounds. (R. at 346.)

4

Bonnie Martindale, a vocational expert, also testified at Hurley's hearing. (R. at 347.) Martindale identified Hurley's job as an interviewer as light[2] work, although she noted that the job consisted mostly of sitting at a sedentary level. (R. at 347.) Martindale identified Hurley's work as a dairy farmer as medium and unskilled work, although she noted that Hurley lifted up to 150 pounds which she stated was "more of a very heavy thing." (R. at 348.) Martindale identified Hurley's work as a fast food worker as light and unskilled, and her job at a convenience store as light and semi-skilled. (R. at 348.) Martindale stated that there were no transferable skills to sedentary, except for her work as an interviewer. (R. at 348.) Hurley's hearing was then continued until she was able to get a mental consultative examination. (R. at 344.)

After having a second hearing continued in order for Hurley's attorney to send a letter to Dr. Lanthorn to see if, in his opinion, Hurley's IQ scores have been lifelong or not, (R. at 352), Hurley had another hearing on October 3, 2007. (354-368.) At this hearing, Hurley testified that she experienced sleep difficulties, explaining that sometimes she will be awake for two or three days at a time, and other times she will sleep for two or three days at a time. (R. at 358.) Hurley testified that the reason for her unusual sleeping was to the fact that she was unable "keep a solid thought in [her] head." (R. at 358.) Hurley noted that her mother and sister help her bathe, dress and groom. (R. at 358.)

Hurley stated that she usually eats sandwiches which she prepares on her own, and that her sister does the housework at her residence. (R. at 359.) She additionally

---

2 Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work,

noted that her step-father performs the outside work at her house and her mother does her grocery shopping.  (R. at 359.)  Hurley mentioned that she has no income and relies solely on her mother and sister.  (R. at 359.)

Hurley testified that, on days when she is awake, she will sit at the kitchen table and look out the window, as well as watch television.  (R. at 359.)  Hurley testified that she does not go out much, but rather stays at home.  (R. at 359.)  Hurley noted that she has had surgery on her gallbladder and spleen, and had a liver biopsy all in the last five years.  (R. at 360.)

When asked about her physical health, Hurley stated that she "stay[s] tired all the time."  (R. at 361.)  In addition, Hurley noted that she has pain in her lower back at least three days per week for which she takes ibuprofen.  (R. at 361.)  Hurley also noted that she has trouble with asthma, and that she quit smoking two months ago, but has since started again.  (R. at 361.)  Hurley also commented on her lack of hearing in her left ear.  (R. at 361.)

When asked about her depression, Hurley stated that she had never had any thoughts of doing harm to other people, but that she has thoughts of attempted suicide at least two or three times per month, in addition to having actually attempted suicide in the past.  (R. at 362.)  Hurley also commented on her crying spells, which usually last two or three days at a time.  (R. at 362.)

---

she also can perform sedentary work.  *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008).

When asked by her attorney about her work at a convenience store, Hurley stated that she had trouble learning how to use the credit card machine, whereby she was unable to remember the codes for the individual cards. (R. at 363.) Hurley additionally stated that she had trouble learning how to distribute lottery tickets, due to the fact that codes were required for each of the different tickets, which Hurley was unable to remember. (R. at 363.) When asked about her work as an interviewer, Hurley clarified that she never actually used a computer, but rather someone was there to enter the information in the computer upon completion of Hurley's phone interviews. (R. at 365.)

Jean Hambrick, a vocational expert, also testified at Hurley's hearing. (R. at 366.) The ALJ posed several hypotheticals, noting that in each of the hypotheticals, Hambrick was to assume a 34-year old with a 12th grade education, but who can read and write at a sixth grade level or less. (R. at 366.) In addition, Hambrick was to assume that such a person had the vocational profile of Hurley and the physical assessment found in Exhibit 6F[3] whereby such person deals primarily with emotional problems. (R. at 366.)

In his first hypothetical, the ALJ asked Hambrick to assume that Exhibit 10F[4] was accurate, and based upon the limitations set forth therein, whether Hurley would be able to perform any of her past relevant work. (R. at 366.) Hambrick responded

---

3 Exhibit 6F is a Physical Residual Functional Capacity Assessment completed by Dr. Frank M. Johnson, M.D., a state agency physician, on August 5, 2005. (R. at 256-261.)

4 Exhibit 10F is a Mental Residual Functional Capacity Assessment completed by Louis A. Perrott, Ph.D, a state agency psychologist, on August 5, 2005. (R. at 277-280.)

7

that Hurley could work as an interviewer, a dairy farmer at the medium level and as a fast food worker as light and unskilled work, however, she would be unable to perform work as a cashier.  (R. at 366-67.)

In his second hypothetical, the ALJ asked Hambrick to assume that Exhibit 13F[5] was accurate, and, based upon the limitations set forth therein, whether Hurley would be able to perform the previous identified jobs.  (R. at 367.)  Hambrick stated that, in her opinion, Hurley could perform such jobs.  (R. at 367.)

In his third hypothetical, the ALJ asked Hambrick to assume that Hurley's condition was worse than the physicians had indicated.  (R. at 367.)  The ALJ asked Hambrick whether Hurley would be able to perform any of her past relevant work, based on Hurley's prior testimony that she rarely left the house, that she needed help with basic dressing, that she had suicidal thoughts and her Global Assessment of Functioning, ("GAF"), score was, at times, 45 to 50.[6]  (R. at 367.)  Hambrick stated that Hurley would not be able to perform any of her past relevant work based on such a hypothetical and her testimony.  (R. at 367.)

---

5 Exhibit 13F is a consultative examination completed by B. Wayne Lanthorn, Ph.D., on January 17, 2007.  (R. at 311-320.)

6 The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41-50 indicates that the individual has "serious symptoms or serious impairments in social, occupational, or school functioning." DSM-IV at 32.

The ALJ further asked Hambrick to consider Hurley's testimony that she sometimes slept for days after being awake for several days, and whether there would be any jobs she could perform if she consistently missed work for two or three days a month or more. (R. at 368.) Hambrick stated that there would be no jobs Hurley could perform based on this information. (R. at 368.)

In rendering his decision, the ALJ reviewed records from Buchanan General Hospital; Dr. H. J. Patel, M.D.; Clinch Valley Medical Center; Dr. Joseph C. Claustro, M.D.; Clinch Valley Physicians; Dr. L. Andrew Steward, M.D.; Dr. Frank M. Johnson, M.D., a state agency physician; Louis A. Perrott, Ph.D., a state agency psychologist; Stone Mountain Health Services; Crystal Burke, LCSW; B. Wayne Lanthorn, Ph.D.; and Dr. Garry T. Bennett, M.D.

Following Hurley's alleged onset date of June 1, 2001, Hurley presented to Buchanan General Hospital on April 20, 2003, with complaints of back pain, lower abdominal pain, cough congestion, fever and dysuria. (R. at 204-209.) Chest x-rays revealed prominent bronchovascular markings through both lungs which could have been due to underlying chronic changes, although the possibility of superimposed bronchopneumonia was not completely excluded. (R. at 209.) Hurley improved with nebulizer treatment and the final diagnoses were bronchitis and dysuria. (R. at 205-07.)

On September 22, 2003, Hurley presented to Dr. H. J. Patel, M.D., with complaints of a middle finger injury on the right hand. (R. at 203.) X-rays of the right middle finger revealed mild degenerative changes and a small, well corticated

9

density at the PIP joint, probably an old injury and less likely an acute fracture. (R. at 203.) It was noted that Hurley's medical history included asthma, recurrent migraine and tension headaches, mixed with generalized and social anxiety disorder with nervousness. (R. at 143.) Dr. Patel's assessment included a bruised right hand, middle finger, leg edema and generalized social anxiety disorder. (R. at 143.) On September 23, 2003, lab tests revealed that Hurley tested positive for hepatitis C, with additional findings including high cholesterol, high AST, high ALT and low creatinine. (R. at 133-142.)

From October 14, 2003, through October 17, 2003, Hurley was admitted to Buchanan General Hospital with chief complaints of smothering in the chest with mucopurulent sputum, persistent vomiting and diarrhea for the previous four days and dizziness. (R. at 196.) On examination, Hurley had moderate to severe wheezing with expiratory/inspiratory scattered rhonchi. (R. at 193.) Hurley denied any headache, diplopia, syncope, hemoptysis, hematemesis, pus, mucus or blood in the stool. (R. at 193.) A review of systems showed Hurley had generalized fatigue and weakness, with recurrent headaches, recurrent bronchitis and pneumonia, lower back pain, knee pain, arthralgia and generalized social anxiety disorder. (R. at 197.) Upon being discharged, Hurley was given a primary diagnosis of acute bronchitis with bronchospasm, and a secondary diagnosis of acute viral syndrome with persistent vomiting and diarrhea, asthma with acute exacerbation, dyslipidemia and hepatitis C with abnormal liver enzymes. (R. at 194.) Hurley was prescribed an Advair inhaler, Combivent inhaler and cough syrup. (R. at 195.)

10

On October 23, 2003, Hurley presented to Dr. Patel for a follow-up examination after being admitted previously for asthma with recurrent bronchitis, pneumonia, migraine and tension headaches, gestional diabetes and anemia during pregnancy. (R. at 245.) After examination, Dr. Patel assessed Hurley with chronic hepatitis, regular menstrual period history and TMJ arthritis. (R. at 245.) Hurley was referred to Dr. Hunter and Dr. Nagarag. (R. at 245.)

From February 5, 2004, through February 10, 2004, Hurley was again admitted to Buchanan General Hospital with chief complaints of increasing smothering in the chest with fever and mucopurulent sputum, persistent vomiting and diarrhea. (R. at 189.) A chest x-ray was suggestive of acute bronchitis. (R. at 189.) A review of systems revealed recurrent headaches, gestational diabetes, low back pain, knee pain, arthralgia and generalized social anxiety disorder. (R. at 190.) Upon discharge, Hurley had a primary diagnosis of acute viral bronchitis with bronchospasm and shortness of breath, and a secondary diagnosis of asthma with acute exacerbation with bronchospasm, viral syndrome with acute gastroenteritis with persistent vomiting and chronic active hepatitis C. (R. at 187.)

Hurley presented to the Emergency Room at Buchanan General Hospital on August 16, 2004, with complaints of earaches, gastroenteritis, vomiting and diarrhea. (R. at 181-184.) On December 23, 2004, Hurley returned to the Emergency Room with complaints of stomach and back pain. (R. at 160-180.)[7]

---

7 These records are largely illegible. (R. at 160-180.)

From December 23, 2004, through December 24, 2004, Hurley was admitted to Clinch Valley Medical Center after being transferred from Buchanan General Hospital with cellulitis on the antecubital area secondary to needle injection. (R. at 221.) It was noted that Hurley was a drug addict who resumed using cocaine six months prior to her visit. (R. at 221.) Hurley also complained of right elbow pain, however, an ultrasound revealed a normal right elbow. (R. at 225.) Additionally, Hurley complained of abdominal pain, where an ultrasound revealed cholelithiasis. (R. at 226.) Hurley was placed on IV antibiotics and wound care, and was discharged with advice to continue taking antibiotics, in addition to having a home nurse to follow the wound. (R. at 221.) Dr. Joseph Claustro, M.D., also referred Hurley to a social worker regarding her drug addiction. (R. at 221.)

On January 16, 2005, Hurley presented to Buchanan General Hospital with chief complaints of right breast pain and swelling. (R. at 151.) A review of systems showed that Hurley suffered from weakness, fever, migraine headaches, anxiety, nervousness and depression. (R. at 151-52.) The assessment consisted of cellulitis, right breast with drug usage, hepatitis C and a history of asthma. (R. at 152.) On March 1, 2005, Hurley returned to Buchanan General Hospital with an abdominal wound and facial contusion. (R. at 144.) X-rays of the chest were normal, while an x-ray of the mandible showed no traumatic pathology, although it could not adequately assess the temporomandibular joints area which would have required alternative examinations to rule out a fracture. (R. at 149-50.)

On March 18, 2005, Hurley underwent surgery performed by Dr. Joseph C. Claustro, M.D. (R. at 218.) Hurley underwent a diagnostic laparoscopy

12

cholecystectomy and wedge liver biopsy after being diagnosed with chronic cholecystitis with cholelithiasis, hepatitis C and right upper quadrant pain. (R. at 218-220.)

From November 12, 2003, through May 3, 2005, Hurley received treatment at Clinch Valley Physicians for complaints including loss of hearing, chronic cough, wheezing, asthma, heartburn, vomiting, diarrhea, hepatitis, headache, depression and anemia. (R. at 243-44.) On February 16, 2005, Hurley presented to Clinch Valley Physicians for a re-evaluation and follow-up for hepatitis C. (R. at 232.) At this visit, Hurley stated that she had not used any IV drugs in over two years, but when she had used drugs, her drugs of choice were heroine and cocaine. (R. at 232.) Hurley was scheduled for an abdominal ultrasound on February 24, 2005, and was told to follow up in the GI Department in one month. (R. at 233.)

On April 13, 2005, Hurley again presented to Clinch Valley Physicians for re-evaluation and follow up for hepatitis C, voicing no GI complaints at the time. (R. at 230.) Hurley had recently undergone a cholecystectomy and a liver biopsy which showed chronic hepatitis consistent with chronic hepatitis C, mildly active, grade I out of IV. (R. at 230.)

On June 3, 2005, Hurley underwent a consultative examination by Dr. L. Andrew Steward, M.D. (R. at 248-255.) Dr. Steward administered several tests including the Wechsler Adult Intelligence Scale-III (WAIS-III), Woodcock Johnson Tests of Achievement-revised, ("WJ-R"), Beck Anxiety Inventory, ("BAI"), Beck Depression Inventory-II, ("BD-II"), and Millon Clinical Multiaxial Inventory-III,

13

("MCMI-III"). (R. at 248.) Dr. Steward noted that Hurley's affect was constricted, her mood was anxious and dysphoric, and she was oriented in all spheres. (R. at 245.) Dr. Steward found no evidence of hallucinations, delusions or paranoia, and he noted that Hurley's thought content and organization were impoverished but not confused. (R. at 249.) It was noted that all of Hurley's mental functions, including fund of information, judgment, abstract reasoning, ability to perform calculations and attention and concentration were depressed. (R. at 249.) Additionally, it was noted that all of Hurley's memory functions, including immediate, recent and remote were also depressed. (R. at 249.)

At the examination, Hurley noted that she was positive for hepatitis C, which caused her pain and fatigue very easily, whereby the pain ran through her back and stomach. (R. at 249.) Hurley reported having no hearing in her left ear, and that she could only hear very high pitches. (R. at 249.) Hurley reported that she was nervous, some days very severely, that she could not stand to be around children, crowds and noise, that she was irritable, but not violent, that her memory and concentration were not good, that she was depressed all the time, that she had suicidal thoughts and had attempted suicide by cutting her wrists four to five times and overdosing three to four times, but that she was not homicidal. (R. at 249.) Hurley additionally noted that sometimes she would sleep all day long, and sometimes she would not sleep well for two or three days, that her appetite was not good and that she had lost weight, that she often cried and felt useless, worthless, helpless and hopeless. (R. at 249.)

Hurley noted that she was physically, emotionally and sexually abused, that she had nightmares, flashbacks and ruminative thoughts about her abuse and that she

14

blamed herself but did not have revenge thoughts. (R. at 249-50.) Hurley noted that she had hypervigilance, that she was psychiatrically hospitalized at age sixteen for 45 days, that she was seen on an outpatient basis for six months after the hospitalization, that the only medication she was on were Vitamins C and E, and she had never been on any psychotropic medications, that she did not use alcohol very much, that she was a recovering drug addict, whereby she started using pain pills and moved on to cocaine, that she went to a women's group once a week at Cumberland Mountain Community Services for treatment, that she smoked a pack and a half of cigarettes each day, and that her legal problems consisted of being in prison on a charge for writing bad checks for 18 months, until she was released on January 2, 2002. (R. at 250.)

WAIS-III testing yielded a Verbal IQ score of 72, a Performance IQ score of 60 and a Full Scale IQ score of 64. (R. at 251.) Thus, on the WAIS-III, Hurley's Full Scale IQ score of 64 fell within the mild mental retardation range and at the first percentile for such scores within the United States population. (R. at 252.) On the WJ-R, broad reading and broad mathematics were advanced over Hurley's overall intellectual functioning level. (R. at 253.) On the BAI, Hurley's total score fell within the severe anxiety range, and on the BDI-II, Hurley's total score fell within the severe depression range. (R. at 253.) On the MCMI-III, all validity scales including disclosure, desirability and debasement fell within the ranges that could be interpreted validly by computer analysis, where significant personality elevations were within depressive, masochistic, dependant, avoidant and schizoid. (R. at 253.)

Hurley's diagnoses included major depressive disorder, recurrent, unspecified; generalized anxiety disorder; polysubstance dependence; mild mental retardation; hepatitis C-positive; no hearing in left ear; and a GAF of 45. (R. at 254.) In summary, Dr. Stewart noted that Hurley's overall functioning was in the mild mental retardation range, with deficits in thinking and reasoning abilities, faculties necessary for an adequate adjustment to a complex environment. (R. at 255.) He additionally noted that Hurley's verbal skills were more pronounced than her visual motor skills, that her broad reading and broad mathematics were advanced from her overall intellectual functioning level, while broad written language fell at ranges commensurate with this. (R. at 255.) He further noted that Hurley had several medical problems, including being hepatitis C positive, that she had developed social and interpersonal skills, but would be influenced by emotional factors and that she had fairly significant levels of depression and anxiety. (R. at 255.) Dr. Stewart opined that Hurley's prognosis for placement in an employment position consistent with her skills and limitations would be considered very guarded at the time of the examination. (R. at 255.)

On August 5, 2005, Dr. Frank M. Johnson, M.D., a state agency physician, completed a Physical Residual Functional Capacity, ("PRFC"), assessment form, in which he found that Hurley could occasionally lift and/or carry items weight up to 50 pounds, frequently lift and/or carry items weighing up to 25 pounds, stand and/or walk for a total of about six hours in an eight-hour workday and sit for a total of about six hours in an eight-hour workday, with unlimited ability to push and/or pull. (R. at 256-61.) Dr. Johnson imposed no postural, manipulative, visual, communicative or

16

environmental limitations. (R. at 256-261.) Based on the evidence of record, Dr. Johnson opined that Hurley's symptoms were not credible. (R. at 276.)

On this same day, Louis A. Perrott, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique, ("PRTF"). (R. at 262-76.) In the category of 12.04 Affective Disorders, Perrott opined that Hurley had the disorder of MDD, recurrent, per CE Vendor, which was a medically determinable impairment that did not satisfy the diagnostic criteria in this category. (R. at 265.) In the category of 12.05 Mental Retardation, Perrott found that Hurley had significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, namely a valid verbal, performance or full scale IQ of 60 to 70. (R. at 266.) In the category of 12.06 Anxiety-Related Disorders, Perrott opined that Hurley had the disorder of GAD, per CE Vendor, which was a medically determinable impairment that did not satisfy the diagnostic criteria in this category. (R. at 267.) In the category of 12.09 Substance Addiction Disorders, Perrott found that Hurley had the disorder of polysubstance dependence, including cocaine, which was a medically determinable impairment that did not satisfy the diagnostic criteria in this category. (R. at 270.)

Perrott found that Hurley had a moderate degree of limitation in her restriction of activities of daily living, difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence or pace. (R. at 272.) Perrott found that Hurley had one or two degrees of limitation in repeated episodes of decompensation, each of extended duration. (R. at 272.) Based on the evidence of record, Perrott found Hurley's statements to be not credible. (R. at 274.)

17

On August 5, 2005, Perrott completed a Mental Residual Functional Capacity, ("MRFC"), assessment form, in which he found that Hurley was not significantly limited in her ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, to carry out very short and simple instructions, to sustain an ordinary routine without special supervision, to make simple work-related decisions, to ask simple questions or request assistance, to be aware of normal hazards and take appropriate precautions and to travel in unfamiliar places or use public transportation. (R. at 277-78.) Perrott found that Hurley was moderately limited in her ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule maintain regular attendance, and be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. at 277-78.) Based on the evidence of record, Perrott found Hurley's statements to be partially credible. (R. at 279.)

From August 9, 2000, through October 3, 2005, Hurley received treatment from Stone Mountain Health Services. (R. at 281-303.) During this time, Hurley complained of many ailments including decreased hearing, frequent ear infections, dizzy spells, sinus trouble, asthma, wheezing, heart murmers, swollen ankles, loss of appetite, overnight urination, frequent headaches, difficulty sleeping, nervousness, cold numb feet, pneumonia, kidney and bladder infections, bleeding problems, pharyngitis, cigarette abuse, bronchopneumonia, influenza, depression, anxiety, domestic violence issues, substance abuse, situational stressors, hepatitis C, weight gain, irregular menses, elevated liver function tests and tachycardia. (R. at 286-303.)

On June 28, 2005, Hurley presented to Crystal Burke, LCSW, at Stone Mountain Health Services, with complaints of multiple stressors, including depression, feelings of worthlessness and frequent crying episodes. (R. at 297.) Burke noted that Hurley did not appear to be depressed, but that she did have a significant history of substance abuse and dependence, although she indicated that she was substance free. (R. at 297.) On July 21, 2005, Hurley again presented to Burke with complaints of depression, panic attacks, hepatitis C and situational stressors. (R. at 296.) Burke noted that she and Hurley discussed coping strategies for depression, in addition to encouraging self-care and nutrition, indicating that Hurley needed to start treatment for her hepatitis C and depression. (R. at 296.) On September 13, 2005, Hurley again presented to Burke for a follow-up appointment. (R. at 289.) Burke noted that Hurley had multiple situation stressors. (R. at 289.)

On January 16, 2007, Hurley presented to B. Wayne Lanthorn, Ph.D., for a consultative examination, in which Lanthorn administered a mental status evaluation

19

and WAIS-III testing. (R. at 311-322.) Lanthorn noted that Hurley had been diagnosed with hepatitis C, but had not received any treatment on a regular basis due to lack of health insurance and finances, that she had life-long asthma and frequent back pain. (R. at 313-14.) Regarding her psychiatric treatment, Hurley reported to Lanthorn that she saw a psychiatrist at Stone Mountain Health Services, in addition to attending a women's group through Cumberland Mountain Services. (R. at 314.) Hurley reported being hospitalized when she was 16 after she attempted to kill herself by overdosing and slitting her wrists. (R. at 314.) When asked about the reason for her attempted suicide, Hurley stated that she became distressed after encountering her biological father who would not speak with her. (R. at 314.) Hurley further reported being physically abused by both her second husband and her children's biological father as well as her stepfather. (R. at 314.)

Lanthorn noted that Hurley could ambulate without difficulty; that her affect was blunt and flat and overall her mood was predominantly depressed; that she showed signs of anxiety to include restlessness, fidgetiness and tearing a piece of paper she had in her hands in little bits during the course of their time together among other things; and that he would describe Hurley's overall mood as agitated depression. (R. at 314.) Hurley reported that she had no problems with her vision; her speech was clear and intelligible; and that she had almost no hearing in her left ear. (R. at 314.) Hurley further reported that she found it difficult to be around people; she described herself as being "paranoid"; she felt weak all of the time and often felt that someone was going to hurt her when she was out; she denied the current use of alcohol, however she admitted to smoking one pack of cigarettes per day; and she denied the

current use of illicit drugs, despite her extensive history of drug use including pain pills, cocaine and heroin.  (R. at 315.)

Lanthorn noted that Hurley described herself as depressed and anxiety-ridden; that she was irritable some days; she reported having little to no energy and often preferred to be alone; she denied ever having hallucinations of any type; that she showed no signs of delusional thinking nor any evidence of ongoing psychotic processes; and she cried on a daily basis.  (R. at 315.)  Lanthorn reported that Hurley made almost no eye contact; she reported scratching her face upon becoming nervous; and there were times in which she appeared to be passive-aggressive and did not respond straightforwardly or very rapidly to questions.  (R. at 315.)

On the WAIS-III test, Hurley achieved a Verbal IQ of 79, a Performance IQ of 68 and a Full Scale IQ of 72, placing her in the borderline range of current intellectual functioning with a corresponding percentile rank being third.  (R. at 315.)  Hurley's diagnoses included polysubstance dependence in sustained full remission; nicotine dependence; physical abuse as an adult; dysthymic disorder, late onset; anxiety disorder, NOS; borderline intellectual functioning; and borderline personality disorder with a then current GAF of 61-65.[8]  (R. at 316-17.)

Lanthorn opined that the results of the psychological evaluation revealed a woman who was currently functioning in the borderline range intellectually and

_____

[8] A GAF of 61-70 indicates that the individual has "[s]ome mil symptoms… or some difficulty in social, occupational, or school functioning…, but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV at 32.

21

appeared to have mild difficulties with concentration but relatively good memory functions. (R. at 317.) Lanthorn noted that Hurley reported being capable of exercising appropriate self-care and performed the required household tasks such as laundry, cooking and housekeeping. (R. at 317.) Lanthorn opined that Hurley seemed capable of functioning in a regular 40-hour workweek, particularly with simple and repetitive tasks. (R. at 317.)

Lanthorn also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) in which he opined that Hurley was not limited in her ability to remember locations and work-like procedures, understand and remember short, simple instructions, carry out short, simple instructions and make simple work-related decisions; that she was mildly limited in her ability to interact appropriately with the public, supervisors and co-workers, and respond appropriately to changes in a routine work setting; and that Hurley was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual, sustain an ordinary routine without special supervision, work with or near others without being distracted by them, complete a normal workday or workweek and perform at a consistent pace. (R. at 318-19.)

On May 23, 2007, Lanthorn responded in a letter to an inquiry made by Disability Determination Services, in which he discussed a comparison of the two WAIS-III Scores generated by himself and by Dr. Steward. (R. at 321.) Lanthorn noted that there was a standard error of measurement of approximately five to six

22

points on either side of the Scale of IQ. (R. at 321.) He further noted that when the standard error of measurement of the 95% confidence intervals, the IQ that Dr. Steward obtained and the one he had obtained could overlap. (R. at 321.) Lastly, Lanthorn opined that both scores were valid. (R. at 321.)

On July 5, 2007, Dr. Garry T. Bennett, M.D., wrote a letter in which he reviewed the psychological evaluations of Dr. Steward and Lanthorn. (R. at 323-24.) After reviewing Hurley's treatment record, Dr. Bennett opined that Hurley's substance use appeared to be in remission and that she appeared to meet the "A" criteria of the 12.04 listing, specifically, the depressive syndrome, as the record indicated that Hurley had experienced a number of depressive symptoms including appetite disturbance, decreased energy, feelings of worthlessness, difficulty concentrating and suicidal thoughts. (R. at 323-24.) Dr. Bennett also noted that there was evidence of anxiety-related problems which would fall under the 12.06 listing. (R. at 324.) Dr. Bennett opined that Hurley did not meet the "B" criteria for either of these two listings, as the record indicated that Hurley lived alone, cooked, performed chores, and met her self-care needs, and, at most, there appeared to be only a "mild" level of impairment in her activities of daily living. (R. at 324.) Dr. Bennett noted that Hurley was uncomfortable around people and had paranoid ideation, which constituted a "moderate" limitation. (R. at 324.) Dr. Bennett noted that the other relevant listing in Hurley's case was in the 12.05 section on mental retardation, as there were two IQ scores in the record, one which appeared to meet the 12.05 requirement of a valid IQ score between 60 and 70. (R. at 324.) However, Dr. Bennett opined that Hurley did not meet this listing, as a diagnosis of Mental Retardation requires a history of deficits

23

in intellectual functioning and adaptive functioning with an onset prior to age 18, and there was no evidence in the record of such deficiencies. (R. at 324.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). The process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

24

By decision dated October 12, 2007, the ALJ denied Hurley's claims. (R. at 12-25.) The ALJ found that Hurley met the insured status requirements of the Act for DIB purposes through October 12, 2007. (R. at 17.) The ALJ also found that Hurley had not engaged in substantial gainful activity since June 1, 2001, the alleged onset date. (R. at 17.) The ALJ found that Hurley suffered from severe impairments, namely chronic hepatitis C, major depressive disorder/dysthymic disorder, anxiety, not otherwise specified, borderline intellectual functioning and asthma. (R. at 17.) The ALJ found, however, that Hurley did not have an impairment or combination of impairments that met or medically equaled the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) The ALJ found that Hurley's hepatitis C and asthma limited her to a residual functional capacity, ("RFC"), for medium work, which involves being able to lift, carry, push and/or pull 25 pounds frequently and 50 pounds occasionally and sit, stand and/or walk for six hours out of an eight-hour workday, with no concentrated exposure to fumes, odors, dusts, gases or poor ventilation. (R. at 23.) The ALJ noted that Hurley's depression, anxiety and borderline intellectual functioning further limited her to simple, routine unskilled work. (R. at 23.) The ALJ found that Hurley could perform her past relevant work as an interviewer, diary farmer and fast-food worker. (R. at 25.) Therefore, the ALJ concluded that Hurley was not under a disability as defined by the Act, and that she was not entitled to benefits. (R. at 24.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

Hurley first argues that the ALJ erred when he failed to find that Hurley meets or medically equals listing of impairments 12.05C. (Plaintiff's Brief In Support Of

Motion For Summary Judgment, ("Plaintiff's Brief"), at 12-17.)  Second, Hurley argues that the ALJ's residual functional capacity determination is not supported by substantial evidence.  (Plaintiff's Brief at 17-23.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings.  This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence.  *See Hays*, 907 F.2d at 1456.  In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence.  *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein.  *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975).  Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the weight given to this evidence.  *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979.)  While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

26

Hurley first argues that the ALJ erred when he failed to find that Hurley meets or medically equals listing of impairments 12.05C. (Plaintiff's Brief at 12-17.)

Based on my review of the record, I find that the ALJ's decision is supported by substantial evidence. There is substantial evidence to support the ALJ's finding that Hurley is not currently disabled, and that she does not meet the requirements for listing 12.05C. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05C. Listing 12.05, in general, is structured differently from other mental disorders listings. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00A. Specifically, the regulations state that:

> Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing. Paragraphs A and B contain criteria that describe disorders we consider severe enough to prevent your doing any gainful activity without any additional assessment of functional limitations. For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work. Paragraph D contains the same functional criteria that are required under paragraph B of the other mental disorders listings.

27

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00A.

Listing 12.05C states that:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05.

Therefore, alongside the two requirements in 12.05C, the introductory paragraph of section 12.05 creates an additional element required to meet the listing for mental retardation, creating a three part test for the listing. *See Smith v. Barnhart*, 2005 U.S. Dist. LEXIS 5975 (W.D. Va. Apr. 8, 2005) (citing *Barnes v. Barnhart*, 116 Fed. Appx. 934, 2004 WL 2681465, *4 (10th Cir. 2004)). Additionally, this introductory paragraph makes it clear that mental retardation is a life long, and not acquired, disability. *See Smith*, 2005 U.S. Dist. LEXIS 5975. Thus, to qualify as disabled under this listing, a claimant must demonstrate that she has had deficits in adaptive functioning that began during childhood, and also demonstrate that she meets

28

the IQ requirement and has a physical or other mental impairment imposing an additional and significant work-related limitation of function. *See Smith*, 2005 U.S. Dist. LEXIS 5975; *see also* 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3) (2007) ("[An impairment] meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement.")

The Fourth Circuit has held that the requirements outlined in the introductory paragraph of Listing 12.05 are mandatory. *Luckey v. U.S. Dept. of Health & Human Servs.*, 890 F.2d 666 (4th Cir. 1989.) ("In dispute are the issues of whether Luckey's low IQ manifested itself in deficits in his adaptive behavior before age 22 and whether he has a physical or mental impairment imposing additional and significant work-related limitation of function."); *accord Norris v. Astrue*, No. 7:07cv184, 2008 WL 4911794, at *2-3 (E.D.N.C. Nov. 14, 2008) (holding the diagnostic description of § 12.05 requires a showing of both low IQ and adaptive functioning deficits); *Hatfield v. Astrue*, No. 5:07cv267, 2008 WL 4449948, at *6 (S.D.W.Va. Sept. 29, 2008) ("[O]ne of the essential features of mental retardation is significant deficits in adaptive functioning."); *Thomas v. Astrue*, No. 1:07cv22, 2008 WL 2169015, at *14 (W.D.Va. May 23, 2008) ("[A]longside the two requirements in 12.05C, the introductory paragraph of section 12.05 creates an additional element required to meet the listing for mental retardation....") (citing *Moon v. Astrue*, No. 6:08-40016 2009 WL 430434 (W.D.Va. Feb. 20, 2009)).

Hurley argues that (1) she possesses a valid performance scale IQ of 60 through 70, and (2) that she possesses a mental impairment that imposes an additional and

29

significant work related limitation of function. (Plaintiff's Brief 16-17.) According to the plain language of section 12.00 governing mental disorders, Hurley must prove that she has deficits in adaptive functioning initially manifested during the developmental period before moving on to the requirements of Listing 12.05C. *See also* Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition) 42 [hereinafter DSM-IV] ("Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning.").

"Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." DSM-IV 42. Hurley claims that her IQ score below 70 is a manifestation of a significant deficit in adaptive functioning. (Plaintiff's Brief 12-17.) The evidence of record shows that WAIS-III testing, administered by Dr. Steward on June 3, 2005, showed Hurley with a Full Scale IQ score of 64.[9] However, Listing 12.05C requires more than a certain IQ score for finding of disability; evidence of an additional impairment imposing a significant limitation and deficits in adaptive functioning must be shown. Grades and IQ scores, without more, do not prove how effectively individuals cope with common life demands and how well they meet the expected standards of personal independence. *See* DSM-IV 42.

---

9 Although Hurley underwent an additional WAIS-III test, administered by Lanthorn on January 16, 2007, which gave her a Full Scale IQ score of 72 (R. at 311-20), the Commissioner does not dispute this finding as being beyond of the required range under 12.05C. This is perhaps due to the fact that Lanthorn, in a letter dated May 23, 2007, opined that both scores are valid, due to standard of error measurements. (R. at 321.)

30

Substantial evidence supports the ALJ's finding that the record does not reflect significant deficits in Hurley's adaptive functioning manifested before age 22. The record indicates that Hurley reported being capable of exercising appropriate self-care and did the required household tasks such as laundry, cooking and housekeeping. (R. at 317.) Dr. Bennett also noted that Hurley lived alone, cooked, performed chores and met her self-care needs. (R. at 324.) In addition, Hurley graduated from high school, where she was in regular classes, and reported having no fails, (R. at 249.), although she acknowledged problems with reading and writing. (R. at 345.) In addition, Hurley never received special education services. (R. at 20, 249, 344.) Hurley also reported to Dr. Steward that she had "no developmental problems," presumably referring to her childhood. (R. at 249.) Furthermore, at the administrative hearing, Hurley was able to comprehend and answer questions asked of her. (R. 341-368.)

It is clear from the record that substantial evidence suggests that Hurley is able to cope with common life demands and is able to function independently, aside from her limited ability to read and write. Substantial evidence supports the ALJ's finding that Hurley has not proven significant deficits in adaptive functioning manifested in her youth, and thus does not meet the requirements of Listing 12.05C.

Even if Hurley were able to show deficits in adaptive functioning starting at the developmental level, substantial evidence supports the ALJ's finding that Hurley does not have another impairment imposing an additional and significant work-related limitation of function. As the court in *Luckey* held, the additional limitation "need not be disabling in and of itself." 890 F.2d at 669 (citing *Branham v. Heckler*, 775 F.2d

31

1271, 1273 (4th Cir. 1985.))  "[T]he inquiry is whether the claimant suffers from any additional physical or mental impairment significantly limiting work-related functions."  *Kennedy v. Heckler*, 739 F.2d 168, 172 (4th Cir. 1984.)

Hurley argues that she meets this second prong based on the ALJ's finding that her chronic hepatitis C, major depressive disorder, dysthymic disorder, anxiety disorder and asthma are all "severe."  (R. at 17.)  In *Luckey*, the court ruled that a claimant's inability to perform his prior relevant work alone established the significant work-related limitation of function requirement of section 12.05(C).  *Branham,* 775 F.2d at 1273.  Further, the court noted that the "Secretary has defined a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities," and "[t]he Secretary's finding that Luckey suffers from a severe combination of impairments also established the second prong of section 12.05(C). 20 C.F.R. §§ 404.1520(c), 404.1521(a) (1988).

In this case, the ALJ, although finding that Hurley suffered from severe impairments, found that Hurley did not have an impairment or combination of impairments that met or medically equaled the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 18.)  Hurley argues that, although the ALJ obtained medical opinions as to whether or not the listing of impairments was met, Dr. Bennett was not asked for an opinion as to the possibility of Hurley medically equaling the listing of impairments; thus the ALJ should have consulted a medical expert regarding the effects of Hurley's combined impairments and the possibility that she might medically equal a listed impairment, as the ALJ is

32

not qualified to interpret this raw data.  (Plaintiff's Brief at 17.)

The Commissioner correctly cites the regulation which states that review by a state agency physician qualifies as consideration regarding the question of medical equivalence.

Social Security Ruling 96-6p states:

> The signature of a State agency medical or psychological consultant on an SSA 831 U5 (Disability Determination and Transmittal Form) or SSA 832 U5 or SSA 833 U5 (Cessation or Continuance of Disability or Blindness) ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review.  Other documents, including the Psychiatric Review Technique Form and various other documents on which medical and psychological consultants may record their findings, may also ensure that this opinion has been obtained at the first two levels of administrative review.

61 Fed. Reg. 34466 (1996).

In this case, Perrott, the state agency psychologist who signed the Disability Determination and Transmittal form and submitted a Psychiatric Review Technique form, (R. at 42, 262-74, 325), opined that "the claimant's impairments are not severe." (R. at 275.) Although Hurley argues that, because Dr. Bennett submitted his opinion after the opinions submitted by the state agency physicians and psychologists, the ALJ is required "obtain an updated medical opinion from a medical expert when additional

33

medical evidence is received that *in the opinion of the ALJ* may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." SSR 96-6p (Plaintiff's Brief at 17) (emphasis added).

The undersigned is of the opinion that ALJ had substantial evidence to justify his decision in not seeking an updated medical opinion regarding Dr. Bennett's letter, in that it was not likely to change the findings of the state agency medical or psychological consultant's findings. The record shows that Dr. Bennett reviewed Hurley's treatment record and opined that Hurley's substance use appeared to be in remission and that she appeared to meet the "A" criteria of the 12.04 listing, and that there was evidence of anxiety-related problems which would fall under the 12.06 listing. (R. at 324.) Dr. Bennett opined that Hurley did not meet the "B" criteria for either of these two listings, as the record indicated that Hurley lived alone, cooked, performed chores, and met her self-care needs, and, at most, there appeared to be only a "mild" level of impairment in her activities of daily living. (R. at 324.) Dr. Bennett noted that Hurley was uncomfortable around people and had paranoid ideation, and this constituted a "moderate" limitation. (R. at 324.) Dr. Bennett noted that the other relevant listing in Hurley's case was in the 12.05 section on Mental Retardation, as there are two IQ scores in the record, one which appeared to meet the 12.05 requirement of a valid IQ score between 60 and 70. (R. at 324.) However, Dr. Bennett opined that Hurley did not meet this listing, as a diagnosis of Mental Retardation requires a history of deficits in intellectual functioning and adaptive functioning with an onset prior to age 18, and there was no evidence in the record of such deficiencies. (R. at 324.)

34

Due to the fact that Perrott had already addressed the issue of equivalency in signing the Disability Determination and Transmittal form and submitting a Psychiatric Review Technique form, and due to the fact that the ALJ had substantial evidence to suggest that Dr. Bennett's letter would not have changed the findings of the State agency medical or psychological consultants, the undersigned does not find that Hurley has proved that her condition equaled the listing requirements. If anything, the letter by Dr. Bennett would support the ALJ's contention that Hurley did not meet or medically equal the requirements of any listed impairment.

And finally, even if Hurley were to meet the other two parts of the test for Listing 12.05C, there is substantial evidence in the record to support the ALJ's finding that her Performance IQ score was invalid. (R. at 22.) The ALJ, finding that Hurley's mental impairments did not meet or medically equal the listing requirements, adopted Dr. Bennett's opinion that Hurley's performance on IQ testing that found an IQ in the mild mental retardation range was likely diminished by her depression and anxiety at that time. (R. at 22.) Dr. Bennett, in reviewing treatment notes from Crystal Burke, Hurley's social worker, noted that during the time period in which the IQ test was administered by Dr. Steward, Hurley "was dealing with depression and anxiety and she had reconciled with a man who was described as abusive." (R. at 323.) In addition, Hurley was prescribed Lexapro to assist in the treatment of her psychological distress, and Dr. Bennett opined that the level of distress may have impaired Hurley's performance on the WAIS-III. (R. at 323.)

Second, Hurley argues that the ALJ's residual functional capacity determination is not supported by substantial evidence. (Plaintiff's Brief at 17-23.) In arguing that Hurley was more mentally limited than found by the ALJ, she specifically argues that the ALJ failed to explain the weight accorded to the opinions of Dr. Steward, Dr. Perrott and Lanthorn, and failed to discuss his reasons for rejecting those opinions. (Plaintiff's Brief at 17-23.)

As stated earlier, in determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). The undersigned is of the opinion that the ALJ's sufficiently explained his findings in making an RFC determination. After discussing all of the relevant evidence of record, including treatment notes from Dr. Steward and Lanthorn, as well as opinions provided by reviewing state agency physicians and psychologists, the ALJ decided to adopt the opinion and limitations noted by Dr. Bennett. (R. at 22.) Although the ALJ did not specifically address the weight given to each medical opinion, or his reasons for rejecting such opinions, the fact that he discussed and reviewed the findings of each physician implicitly shows that he gave each opinion due consideration. Ultimately, the ALJ adopted the opinion of Dr. Bennett finding that "his conclusions [were] supported by the claimant's activities of daily living, the objective evidence, the evaluation and opinion of Lanthorn and the treatment notes of claimant's counselor [Crystal Burke]." (R. at 22.)

In addition, the ALJ based his RFC determination on the vocational expert's

36

testimony at the hearing. Social Security Ruling 82-61 states that the claimant should be found not disabled "[w]here the evidence shows that a claimant retains the RFC to perform the functional demands and job duties of a particular past relevant job as he or she actually performed it," or where "the claimant retains the capacity to perform the functional demands and job duties of the job as ordinarily required by employers throughout the national economy." SSR 82-61.

In this case, the vocational expert, Jean Hambrick, was asked to assume a 34-year old with a 12th grade education, but who can read and write at a sixth grade level or less. (R. at 366.) In addition, Hambrick was to assume that such a person had the vocational profile of Hurley and the physical assessment found in Exhibit 6F whereby such person deals primarily with emotional problems. (R. at 366.)

Hambrick stated that, based upon the limitations, the claimant could perform her past relevant work as an interviewer, a dairy farmer at the medium level, and as a fast food worker as light and unskilled work. (R. at 366-67.) In a second hypothetical, the ALJ asked Hambrick to assume that Exhibit 13F was accurate, and, based upon the limitations noted therein, whether Hurley would be able to perform the jobs she identified for a hypothetical with those restrictions. (R. at 367.) Hambrick stated that, in her opinion, Hurley could perform such jobs. (R. at 367.)

Due to the fact that the ALJ posed hypothetical questions that were supported by substantial evidence of record, it was proper for him to rely on the vocational expert's testimony that Hurley was able to perform her past relevant work. As a result, the ALJ was justified in making Hurley's RFC determination that she was not

37

disabled, despite the fact that he did not specifically address the weight given to each medical opinion and his reasons for rejecting them.

## *IV. Conclusion*

For the foregoing reasons, I will grant the Commissioner's motion for summary judgment and deny Hurley's motion for summary judgment.

An appropriate order will be entered.

**ENTER:** This 4th day of May, 2009.

/s/ Glen M. Williams
SENIOR UNITED STATES DISTRICT JUDGE